F I L E D
Clerk
District Court

AUG 29 2007

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# UNITED STATES DISTRICT COURT

# DISTRICT of the NORTHERN MARIANA ISLANDS

|  |  |
|---|---|
| UNITED STATES of AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>JOSEPH V. SANTOS, )<br><br>Defendant. ) | Case No.: **07- 00025**<br><br>**INFORMATION**<br><br>Violation of 18 U.S.C. § 1341<br><br>Mail Fraud<br>(Count 1) |

The Office of the United States Attorney alleges that:

## COUNT 1

### I.    INTRODUCTION

1.      Marianas Pacific Distributors ("MARPAC") is a wholesale distributor located on Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI"). It is a wholly owned subsidiary of a company called Ambros, Inc., a closely held corporation in Guam. MARPAC is the Anheuser-Busch franchisee for the CNMI. Among other things, it sold beer products to retail vendors on Saipan.

2.      Defendant, JOSEPH V. SANTOS, was the General Manager of MARPAC from 1994 until March 2006. MARPAC first hired Defendant in 1993 but promoted him the following year when the general manager position became vacant. In the years 2003 – 2006, MARPAC paid Defendant a salary at the rate of approximately thirty thousand dollars ($ 30,000.00) per year.

3.      As the general manager, Defendant was the highest ranking employee at MARPAC. He was responsible for managing plant, personnel, and operations. He had authority over the other employees and could approve and sign a variety of documents relating to MARPAC's financial business, including checks drawn on the MARPAC accounts.

4.      As part of its business, MARPAC prepared, kept, and maintained a variety of accounting, inventory, and other business-related records generated by and necessary to its operations. Pursuant to regular procedures established by Ambros, Inc, its parent company in Guam, MARPAC was required to provide -- and provided -- in the ordinary course of its business, originals or copies of such records to Ambros, Inc,.

5.      Among other things, these materials were used by the company's accounting firm to audit the company's books, records, and financial condition. MARPAC transmitted such records to Ambros, Inc. frequently and on a regular basis, as Defendant well knew, by United States Mail.

## II.    THE SCHEME AND ARTIFICE TO DEFRAUD

### A.    Object of the Scheme

6.      Between in or about January 2003 and in or about April 2006, Defendant devised a scheme and artifice to defraud MARPAC and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises. The object of the scheme was to take money belonging to MARPAC, to keep that money for himself, and to use it for his own personal purposes. By carrying out the scheme, Defendant wrongfully obtained approximately five hundred twenty thousand dollars ($ 520,000.00) more or less.

### B.    *Manner and Means*

6.      As part of the scheme, Defendant created false invoices purporting to charge

MARPAC for services or products provided by different retailers.  These businesses included

Monika's Furniture, St. Anley's Auto Repair, Chico's Body Shop, and Joe Ten Motors.  In fact,

these businesses did not provide the services or products for which the fraudulent invoices

purported to charge MARPAC.

7.      As a further part of the scheme, Defendant created false documents to make it

appear that MARPAC had run promotions at different restaurants or bars, including Hard Rock

Café and Round 2, when in fact it had not done so.  The documents included letters describing

the promotions as well as records purporting to show that the establishment and MARPAC had

agreed on the promotion and its details.

8.      In order to "pay" the costs supposedly incurred by MARPAC for these services,

products, and promotions, Defendant would draft a check drawn on a MARPAC business

account.  Typically, he made the check payable to the individual owner of the business or retail

establishment rather than the business or establishment itself.  Defendant would then sign the

check on behalf of MARPAC, forge the endorsement of the payee, and then negotiate the check.

9.      One way Defendant "negotiated" the checks and obtained money from the

MARPAC accounts was to collect otherwise legitimate payments from certain retailers with

whom MARPAC was, in fact, doing business.  This part of the fraud involved substituting the

fraudulently drawn and endorsed checks for cash that these actual MARPAC customers were

paying for products MARPAC had delivered to them.

a.      As a general rule, MARPAC obtained payment at the time it delivered

products to a  retailer client.  The MARPAC driver ordinarily delivered goods to the retailer,

3

collected payment, and then gave the receipts to an office employee who was responsible for turning them into the accounting unit.  Some vendors would pay MARPAC by check, some in cash, and some with a combination – including checks used by the vendor's customers to make retail purchases.  In those latter cases, after making a sale and getting a check, the vendor endorsed the check over to MARPAC and used it to make up part of the vendor's payment to MARPAC.

      b.    Sometime in or about 2002, Defendant changed these procedures for certain of MARPAC's vendor clients.  He created a "pre-sales program" in which drivers would make deliveries as usual but would not collect payments themselves.  Rather, Defendant and other employees that he had selected would later visit the retailer and collect payment for the deliveries.

      c.    As a means of carrying out his scheme, Defendant would take cash from the amounts collected from the vendors.  In place of the cash, he would substitute the checks he had drawn on the MARPAC business accounts to pay for the fictitious services, products, and promotions that he had fraudulently documented.  Unlike the procedure followed with the receipts from other vendors, Defendant himself handled the receipts for customers in the "pre-sales" program from whom he had purported to collect payment.

    10.    As part of the scheme, and in order to maintain and conceal it, Defendant included or substituted in the records MARPAC mailed to Ambros, Inc. in Guam the false and fraudulent records he had prepared and generated in carrying out the scheme and artifice to defraud.  These records included original MARPAC checks, vouchers processed for each check, invoices, letters relating to purported promotional activities, and documents supposedly confirming agreements with various MARPAC customers.

11.    Between in or about January 2003 and in or about April 2006, Defendant made more than five hundred twenty thousand dollars ($ 520,000.00) in unexplained cash deposits into four (4) separate bank accounts, two (2) with First Hawaiian Bank and two (2) with Bank of Hawaii.  The total unexplained cash deposits were five hundred twenty-one thousand eight hundred thirteen dollars and forty cents ($ 521,813.40):

    **a.    First Hawaiian Account No. 17-205692**

Defendant maintained this account from January 21, 2003 until April 6, 2006. During that time, he made total cash deposits of two hundred eighteen thousand seven hundred nine dollars and fifty-seven cents ($ 218,709.57).

    **b.    First Hawaiian Account No. 5297-9659-1501-4989**

Defendant maintained this account from February 10, 2003 until April 10, 2006. During that time, he made total cash deposits of one hundred thirteen thousand four hundred fourteen dollars and eighty-three cents ($ 113,414.83).

    **c.    Bank of Hawaii Account No. 0032-027717**

Defendant maintained this account from August 2, 2004 until February 7, 2006. During that time, he made total cash deposits of one hundred ten thousand two hundred nine dollars  ($ 110,209.00).

    **d.    Bank of Hawaii Account No.6032-160202**

Defendant maintained this account from February 20, 2005 until February 27, 2006.  During that time, he made total cash deposits of  seventy-nine thousand four hundred eighty dollars ($ 79, 480.00).

### III.    *Use of the Mails*

12.    On multiple dates between on or about January 1, 2003 and on or about April 30, 2006, Defendant JOSEPH V. SANTOS, within the District of the Northern Mariana Islands and elsewhere, having devised a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice and attempting to do so, knowingly placed and caused to be placed in a post office and authorized depository for mail matter and caused to be delivered by mail matters and things, that is, MARPAC business and financial records, according to the directions thereon.

In violation of 18 U.S.C. § 1341.

LEONARDO M. RAPADAS
United States Attorney
District of Guam and CNMI

CRAIG N. MOORE
Assistant United States Attorney